## Richmond.

### CARDWELL v. KELLY.

JANUARY 27, 1898.

Absent, Cardwell, J.

1. STOCK SUBSCRIPTION—*Suit by Receiver—Defence of Illegal Considera-tion—Maxims "nemo allegans" and "in pari delicto."*—In an action by a receiver of an insolvent corporation against a stockholder, to re-cover a stock subscription for the benefit of ·creditors whose debts were contracted on the faith of his and other subscriptions, where the contract of subscription is lawful on its face, and the creditors have no knowledge of its vice, the stockholder cannot defend on the ground that he was allured into making the subscription by the chance of obtaining one or more lots in a drawing for distribution of lots of unequal value. In determining whether or not such con-tracts shall be enforced courts consider whether the good of the public, and the policy of the law, will be best subserved, and the making of such contracts be discouraged, by enforcing the contract, or by refusing to do so. In the case at bar the contract should be enforced. For a discussion of the maxims *"nemo allegans"* and *"in pari delicto"* see opinion of the court.

Error to a judgment of the Circuit Court of the city of Richmond, rendered February 18, 1897, in a proceeding by motion wherein the plaintiff in error was the plaintiff, and the defendant in error was the defendant.

*Reversed.*

The plaintiff in error was the receiver of the Chancery Court · of the city of Richmond in the suit of *Flournoy* v. *Virginia Steel, Iron & Slate Co.,* and as such receiver was directed to collect, by suit or otherwise, forty-five *per cent.* of the subscrip-tions to the stock of the defendant company. It was conceded that the company was insolvent, and that its creditors could not

be paid unless the forty-five *per cent.* assessment made on the stockholders was collected.

The plaintiff proceeded by motion in the Circuit Court of the city of Richmond. The defendant pleaded non-assumpsit, "and by consent of parties it was ordered that the defendant may, under the said plea and issue, show in evidence and rely on as a defence to this action, any fraud in the procurement of the alleged contract in the notice mentioned, failure of consideration therefor, illegality thereof, or that the same is barred by the statute of limitations, as if the same were specially pleaded.

"And on motion of the plaintiff the court requires the defendant to set out and specify the grounds of defence to this action. Whereupon the said defendant specifies the following as his ground of defence to the plaintiff's said action: That the consideration or a material part thereof, moving from the plaintiff to the defendant which induced him to subscribe to the stock of the defendant company as charged in the notice was the promise or undertaking of said company as set forth in its prospectus to distribute among the subscribers to its stock by lot, under the direction of the president and board of directors, lots, or villa sites, or both, of unequal value, and that such proposal constituted such scheme a lottery, and rendered void the contract or agreement in the notice mentioned."

The plaintiff to maintain the issue on his part offered in evidence an agreed statement of facts showing his appointment and qualification as receiver, the call made by the Chancery Court, the necessity for the call, the insolvency of the company, the directions to sue, and the defendant's contract of subscription in the following words and figures:

*"Subscription."*

"The undersigned, M. Kelly, of Richmond, hereby subscribe for twenty shares of the capital stock of the Virginia Steel, Iron and Slate Company, and agree to pay for same upon the terms and subject to the conditions specified in the prospectus issued by the board of directors of the

company. This subscription is made with the privilege of taking town lots, as set forth in said prospectus, and shall be valid and binding, and payable upon the call of the board of directors.

"Signed in duplicate this 20th day of Oct., 1890.      M. KELLY."

The defendant, to maintain the issue on his part, was allowed to introduce, notwithstanding the objection of the plaintiff, sundry witnesses who testified that the lots of the company were of unequal value and could not be so assigned to stockholders as to give to each lots of equal value, and the following extract from the prospectus of the company:

"Purchasers of every two shares of the company's stock will be entitled to one lot in the proposed town; and for every twenty shares an additional villa site, not less than one-half acre. This right is to be exercised by lot when fifty dollars shall have been paid on each share of stock subscribed for.

"These lots will be from 25 to 50 feet front, by 125 to 150 feet deep (according to location) to front on streets not less than 60 feet wide— to be laid off in the proposed city under the direction of the president and board of directors, and shall be distributed among the stockholders entitled thereto by lot under regulations to be prescribed by the president and board of directors. The 4,000 acres of desirable town site belonging to the company will make from 20,000 to 25,000 building and residence lots, and the company now offers for sale its valuable stock, with the above-mentioned lot-privilege, reserving the privilege of withdrawing the bonus of lots at any time.

"After setting aside those lots and villa sites for the purchasers of the stock, and reserving a large amount for manufacturing sites, hotels, parks, and other purposes, there will remain from 8,000 to 10,000 lots to be sold by the company. The proceeds of sale will be added to the surplus of the company. These lots will be designated on a map to be issued before the allotment is made, and to be sold when there is a demand for them at good prices.

"This, alone, will be a source of considerable revenue to the stockholders, and, judging from the experience of other enterprises organized under much less favorable conditions, there will be realized from this, alone, a sum equal to the entire capital stock of company."

To the ruling of the court allowing the witnesses to testify as aforesaid the plaintiff excepted. There was a verdict for the defendant, which the plaintiff moved to set aside, but the court

overruled the motion, and rendered judgment for the defendant,. and the plaintiff again excepted.

*Leake & Carter*, for the plaintiff in error.

*H. R. Pollard*, for the defendant in error.

RIELY, J. delivered the opinion of the court.

The sole question for decision is whether a subscriber to the stock of a corporation, who was allured to make the subscription by the chance of being allotted a lot or lots in a drawing for distribution of lots of unequal value, can by reason thereof escape the payment of the money due on his subscription not to the corporation, but to its creditors, whose debts were contracted upon the faith of his and other subscriptions.

It is a fact conceded in the record that the corporation, the Virginia Steel, Iron & Slate Company, is insolvent, and that its creditors cannot be paid their debts unless the assessment of 45 *per cent.* made by the Chancery Court of the city of Richmond on its stockholders is collected.

In conformity to the Constitution of the State, the buying, selling, or transferring of tickets or chances in any lottery is prohibited by statute, and a penalty therefor prescribed. Const., Art. V., sec. 18; Code, secs. 3825, 3826. Whether the scheme out of which this controversy has arisen is within the prohibition of the statute, we express no opinion, as, in the view we take of the case, it is unnecessary to decide that question.

It is a general rule, as stated by an able law writer, that a contract or an agreement cannot be made the subject of an action if it can be impeached on the ground of dishonesty, or as being opposed to public policy—if it be either *contra bonos mores*, or forbidden by the law. Broom, Leg. Max. 706.

A defendant, against whom it is sought to enforce such a contract, may show its illegality, and a court of justice will de-

cline to lend its aid to enforce a contract thus wrongfully entered into. Where, however, the parties are in *pari delicto*, but the plaintiff can make out his case without disclosing the unlawful nature of the contract, it is not a universal rule that the defendant will be allowed to show its illegality for the purpose of defeating the action.

Contracts which are founded upon an illegal consideration, as being immoral or contrary to public good, or which are forbidden by law, are void; and in the language of Chief Justice Wilmot, in *Collins* v. *Blantern*, 1 Smith Lead. Cas. 646, "the reason why the common law says such contracts are void, is for the public good." They are injurious to the community, and violative of the policy of the law; and so the courts, having in view the good of the public, and the policy of the law, will not lend their aid to enforce such a contract unless they can see that to do so will defeat the object of the illegal transaction, and promote the interests of society, and the policy of the law. But where, in the particular case, it appears that this will be the result of the enforcement of such contract, the maxim, "*nemo allegans turpitudinem suam audiendus,*" is rigorously applied, and the defendant will not be allowed to plead and prove his own wrong.

In *Stark* v. *Littlepage*, 4 Rand. 368, Judge Green, in commenting on the maxim, "in *pari delicto, potior est conditio defendentis,*" said: "But this rule applies only in cases where the refusal of the courts to aid either party frustrates the object of the transaction, and takes away the temptation to engage in contracts *contra bonos mores*, or violating the policy of the laws. If it be necessary, in order to discountenance such transactions, to enforce such a contract at law, or to relieve against it in equity, it will be done, though both the parties are in *pari delicto*. The party is not allowed to allege his own turpitude in such cases, when defendant at law, or prevented from alleging it in equity, whenever the refusal to execute the contract at law, or the refusal to relieve against it in equity, would give

effect to the original purpose, and encourage the parties engag-
ing in such transactions."

In a case of the nature of that at bar, the court will be gov-
erned in some degree, at least, by its particular circumstances.
It will consider whether the good of the public and the policy
of the law will be subserved, and the making of such contracts
be discouraged, by enforcing the contract in the case before
it, or by refusing to do so, and will do the one of the other as
will advance the interests of the public and the policy of the law.

It is apparent that to enforce the contract in this case will
defeat the illegal purpose of the parties to it, and tend to deter
other persons from entering into similar contracts, thereby
upholding the policy of the law, and promoting the public
good.   To refuse to enforce it would encourage the making of
such contracts; for, if the venture succeeded, the parties would
reap the profits, and, if it failed, would suffer no loss.

If the corporation was seeking to recover the subscription,
and was solvent, then, inasmuch as its payment would enable
the unlawful design of a lottery to be carried out, it would be
proper to allow the defendant to show the unlawful purpose,
in order to defeat the transaction and prevent similar ones in the
future; but to allow him to do so after it has become insolvent
would confer immunity from liability on the guilty, and not
restrain, but encourage, such illegal schemes.

Moreover, the refusal to enforce payment of the subscription
after insolvency of the corporation would not only fail to ad-
vance the interests of the public, and contravene the policy of
the law, but would result in great injustice to innocent creditors.
This is not an action by the corporation, one of the guilty
parties, seeking to enforce payment of the illegal subscription,
but an action by the receiver of the court, appointed at the in-
stance of creditors of the corporation, to collect the subscrip-
tions due to it, for the purpose of paying its debts.

It was asserted by Lord Mansfield in *Montefiori* v. *Monte-
fiori*, 1 W. Bl. 364, and repeated by Broom in his work on

Legal Maxims, that "it is an indisputable proposition that, as against an innocent party, no man shall set up his own iniquity as a defence, any more than as a cause of action."

In *Pettit* v. *Jennings*, 2 Rob. 676, we have a forcible illustration of the application of this principle in the case of an illegal and void contract. In that case the attempt was made to be relieved from the payment of a bond that was alleged to have been given for a gaming consideration, as against the assignee thereof, who had been induced to purchase the bond by the assurance of the obligor that there was no objection to its payment, and that it would be paid. The court denied relief to the obligor, upon the ground that he was estopped by his conduct from showing the unlawful consideration of the bond. Judge Baldwin, who delivered the prevailing opinion in the case, said, after adverting to the doctrine of estoppel: "I can perceive no good reason why a gaming security should form an exception to the general rule on this subject, which rests upon principles of justice equally applicable, whether the debt be void in its inception, or be avoided by payment or release, or by any other matter *ex post facto*. It is true that a contract or security which is void, either by positive law, or upon principles of public policy, is deemed incapable of confirmation; but the doctrine we are considering is not based upon the idea of confirmation, which excludes the supposition of fraud, but upon the fact of fraud in the original representation or subsequent denial, which, to prevent iniquity, is made to operate as an estoppel. Admissions which have been acted upon by others are conclusive upon the party making them in all cases between him and the person whose conduct he has influenced, and the party is estopped, on grounds of public policy and good faith, from repudiating his own representations."

The capital stock of a corporation is its basis of credit. It is to this that persons dealing with the corporation look, and upon which they rely as security for the payment of its obligation. They have the right to assume, in the absence of knowl-

edge to the contrary, that it exists in fact; that it has been fully paid, or is vouched by valid subscriptions. The defendant in error and his fellow-subscribers, by their subscriptions, enabled the Virginia Steel, Iron & Slate Company to organize and engage in the business for which it was incorporated, and in the prosecution whereof it contracted debts to insolvency. Those who dealt with it, having no knowledge of any vice in the subscriptions, were entitled to rely upon its capital stock as having been lawfully created. The subscribers to its stock, having by their conduct enabled the company to hold out to the public that it had a validly subscribed capital stock, are estopped to deny the reality of what they made to appear to exist, and upon which others were led to rely. The law in such a case makes the apparent real, as to those who have been thus misled to their injury.

In *Martin* v. *South Salem Land Co.*, 94 Va. 28 (a case that was most carefully considered), subscribers to the stock of a joint-stock company who asserted that they had been defrauded in making their subscriptions, were held to be estopped, though innocent, from setting up the fraud as a defence, because they had failed to repudiate their subscriptions until after the company had become insolvent. The estoppel was raised in that case in favor of the creditors of the company, against innocent subscribers, merely because they had delayed too long in repudiating their subscriptions. There mere delay was the ground of the estoppel. How much greater reason is there for holding that subscribers to the capital stock of a company are estopped, as against creditors, from setting up the invalidity of their subscriptions, as to which, if invalid, the subscribers were in *pari delicto!* By their conduct in making the subscriptions they enabled the company to obtain credit on the faith thereof, and to allow them now to repudiate their subscriptions would operate as a fraud on the creditors.

Neither the contract of subscription, nor the prospectus which was referred to and made a part of it, was unlawful on its

face.    Their introduction in evidence was all that was neces-
sary to make out a *prima facie* case, so that the plaintiff could
make out his case without disclosing anything unlawful in
the transaction.    Its unlawfulness had to be shown by the de-
fendant.    This he could only do by pleading and introducing
proof of his own unlawful conduct.    And this he was estopped
from doing as against creditors whom his unlawful conduct had
contributed to mislead, and whom the plaintiff represents.

The Circuit Court erred in the admission of evidence on the
part of the defendant to prove the illegality of the contract of
subscription, and its instruction to the jury.    Its judgment
must therefore be reversed, the verdict of the jury set aside,
and a new trial awarded, to be had in accordance with the views
expressed in this opinion.

*Reversed.*