Bendet v. Ellis.

Mrs. Ella Bendet, *Admx.*, v. Chas. P. Ellis *et al.*
Mrs. Ella Bendet, *Admx.*, v. Isaac B. Ellis *et al.*
Mrs. Ella Bendet, *Admx.*, v. Morris Ellis *et al.*
Mrs. Ella Bendet, *Admx.*, v. Illinois Mutual Life
Insurance Company *et al.*

*(Nashville.   December  Term,  1907.)*

1.  **LIFE INSURANCE.  Assignee  by  wagering  contract  collect-
ing policy must account to the insured's estate, when.**

Where a policy of insurance, on the life of the applicant therefor
was issued payable to his executors, administrators, or assigns,
in pursuance of an express agreement entered into between
himself and a third person to whom the policy was subsequently
assigned, with a knowledge of all the facts by the agent of
the insurer soliciting the insurance, that when the policy was
issued it should be so assigned, in consideration of which the
said assignee was to pay the premiums thereon, which he did,
and at insured's death to pay his estate a specified per cent.
of the amount realized on the policy; and where, upon the death
of the insured, the insurer paid the policy to the assignee, the
transaction on the part of the third party and assignee was a
purely speculative and wagering one, and the administratrix
of the insured was entitled to the sum collected on the policy,
less the amount of premiums paid by such assignee.  (*Post,
pp.* 279-300.)

Cases cited and approved:  Quinn v. Catholic Knights, 99 Tenn.,
80; and numerous cases in other jurisdictions cited on pages
290-294, of the opinion.

Cases cited, distinguished, and approved:  Bloomstein v. Bloom-
stein, 1 Tenn. Chy. App., 187; and numerous cases in other ju-
risdictions cited on pages 294-300 of the opinion.

Bendet v. Ellis.

2. **CONTRACTS.** Fund realized from an illegal transaction, and paid over to a third person for one of the participants is recoverable by such participant as upon an implied promise.

Where a fund realized as the result of an illegal transaction was paid over to a third person for one of the participants in the transaction, such third person cannot retain the fund on the ground of the illegality of the original transaction; for the law will raise an indebtedness in assumpsit against him in favor of the party for whose benefit the fund was placed in his hands. (*Post, p.* 296.)

Cases cited and approved: McMullen v. Hoffman, 174 U. S., 656, 657; Tenant v. Elliott, 1 Bos. & P., 2.

3. **SAME.** Same. Misrepresentation by insured to insurer is a defense available only to insurer, and not to the assignee collecting the policy when sued for an accounting to insured's estate.

The fact that the insured in his application for a policy on his life misrepresented to the insurer his age and physical condition, and the fact that his wife, who upon his death became his administratrix, had knowledge thereof, and in her deposition tried to maintain the truth of these representations, when she must have known that they were false, cannot defeat the right of the wife, as administratrix to recover the amount of the policy paid to an assignee of the policy under an arrangement amounting to a wagering contract or transaction. The defense of misrepresentation was one available only to the insurance company, and after it paid over the money, the question cannot be raised by any one. (*Post, pp.* 300, 301.)

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County. —JOHN ALLISON, Chancellor.

Bendet v. Ellis.

Brown & Akers and John R. Aust, for complainant.

J. J. Vertrees, W. O. Vertrees, and J. M. Anderson, for defendants.

---

Mr. Justice Neil, delivered the opinion of the Court.

This case involves the ownership of a fund of $7,730.82 and interest thereon, in the hands of trustees, heretofore paid over to the defendants Ellis, in settlement of certain insurance policies. The fund is claimed by Mrs. Bendet, as administratrix of her deceased husband, Solomon Bendet. The defendants Ellis insist that the fund belongs to them. Pending the settlement of the controversy this money was paid over into the hands of the trustees referred to, to await the decision of the cause.

The facts on which the controversy turns are as follows:

On the 10th day of September, 1898, application was made, in the name of Solomon Bendet, to the Security Trust & Life Insurance Company, for insurance on the life of said Bendet, in the sum of $10,000. On this application three policies of insurance were issued, as follows: No. 8838, for $6,000; No. 8839, for $2,000; No. 8840, for $2,000. On the 8th day of October, 1898, policy No. 8838 was assigned to Charles P. Ellis, and No. 8839 and No. 8840 were assigned to I. B. Ellis.

On the 26th day of May, 1900, another application was made in the name of Solomon Bendet for an ad-

ditional insurance on the life of said Bendet to the Kansas Mutual Life Insurance Company for the sum of $10,000. On this application four policies of insurance were issued June 25, 1900, as follows: No. 21259, for $1,000; No. 21260, for $2,000; No. 21261, for $2,000; No. 21262, for $5,000.

All these policies in the Kansas Mutual Life Insurance Company were reinsured by the Illinois Mutual Life Insurance Company.

On the 11th day of August, 1900, policy No. 21259 was assigned to I. B. Ellis; on the 27th day of June, 1900, policy No. 21262 was assigned to Morris Ellis; and on the 11th day of August, 1900, policies No. 21260 and 21261 were assigned to Charles P. Ellis.

Bendet, the insured, died in December, 1903, and in due time proofs of his death were furnished by the Ellises to the two companies in which his life was insured, as alleged in the various bills filed by the complainant.

Soon thereafter the original bills were filed—that is, on June 2, 1904—asserting ownership of the policies in the estate of Bendet, and that the various Ellis defendants, who were made parties thereto, were entitled to retain only so much as might be owing to them by the estate of Bendet for any indebtedness incurred by him to them.

Amended bills were filed July 26, 1904, praying judgment against the insurance companies for the amount of the policies.

On December 15, 1904, the Ellis defendants answered, setting up the assignment of the policies to secure certain specified debts, and amounting in the aggregate to almost the face value of the policies, which they averred were just and owing, and admitting that complainant, as administratrix, was entitled to the residue of the proceeds.

The defendant insurance companies answered, December 13, 1904, admitting the issuance of the policies sued on and the payment of premiums, but denying liability thereon upon the grounds of misstatement as to age and condition of health; that the assignee had no insurable interest in the life of the deceased; and, therefore, that said policies were void as wagering contracts.

About the time that the original bills were filed in the chancery court, the Ellises, assignees of the various policies, brought suit on said policies in their own name against the defendant insurance companies in the circuit court of Davidson county. The style of these suits being as follows: "Charles P. Ellis v. Illinois Mutual Life Insurance Company;" "Charles P. Ellis v. Security Trust & Life Company;" "Morris W. Ellis v. Illinois Mutual Life Insurance Company;" "Isaac B. Ellis v. Illinois Mutual Life Insurance Company;" "Isaac B. Ellis v. Security Trust & Life Company."

As observed from what has already been said, the only controverted question between the complainant, upon the one side, and the Ellises, upon the other side, was as to the extent or amount of the indebtedness of Solo-

mon Bendet to the defendants Ellis; it being the theory and contention both of the complainant and of the defendants Ellis, as the case was originally projected, that all of the various insurance policies were valid and subsisting obligations against the companies issuing them.

Upon the issues thus made up, much proof was taken, as a result of which it was established that, while all of these policies appear on their face to have been issued directly to Solomon Bendet, payable to his executors, administrators, or assigns, and were all of them thereafter assigned in due form to the Ellises, yet as a matter of fact said policies were applied for by Solomon Bendet in pursuance of an express agreement, entered into between him and the Ellises, to whom the policies were subsequently assigned, that when said policies were issued they should be assigned to the said Ellises, in consideration of which the Ellises agreed to pay all premiums on said policies during the lifetime of the said Bendet, and at Bendet's death to pay to his estate ten per cent. of the amount that they (the Ellises) should realize on the same.

As the statement of the witness Vaughn is short and complete, we will quote it in full.

It was agreed by the parties that, if Frank Vaughn were called to testify, he would state in substance as follows:

"That, at the time the various policies sued on in the above-entitled causes were issued on the life of Solo-

mon Bendet, he, the said Frank Vaughn, was the part-
ner of J. M. Ragan; that the business of said partner-
ship was that of general insurance agents, and as such
they solicited and wrote the policies in suit; that he
was present during certain of the negotiations between
Ragan and Bendet and the Ellises for the issuance of
all said policies; that it was agreed in advance of the
issuance of said policies that, when issued upon the
life of Solomon Bendet, they should be respectively as-
signed to Charles P. Ellis, Morris Ellis, and I. B. Ellis;
that it was a part of said agreement that the said Ellises
were to pay all the premiums to become due upon the
policies assigned to them, respectively; that, in consid-
eration of the taking out of these policies by the said
Bendet and the assignment of them to the said Ellises,
the said Ellises were to pay to Mrs. Bendet, or to the
estate of Solomon Bendet, upon his death, ten per cent.
of the proceeds of said policies. It was further agreed
between the said Bendet and the said Ellises that he
would execute his promissory notes to them for certain
sums of money. These notes did not represent any
actual indebtedness to the said Ellises, and there was
no further consideration for their execution, except to
support and give color to the assignment of the policies
to be made to the said Ellises by the said Bendet, as
hereinbefore stated."

All the premiums were paid by the Ellises.

During the time that the evidence in this case was
being taken by which the above facts were established,

it seems that the matters involved in the litigation, in so far as the Ellises and the insurance companies were concerned, were compromised and settled.

The following stipulation was filed in the evidence:

"That since the above causes have been at issue the defendants, the Illinois Life Insurance Company and the Security Trust & Life Company, and Charles P. Ellis, Morris Ellis, and I. B. Ellis have entered into an agreement, whereby the suits they have pending against said companies on the policies mentioned in the pleadings have been compromised and adjusted by the payment of $9,500, in the aggregate, in full settlement of all of said $20,000 of policies."

After the filing of this stipulation, the complainant filed what are denominated "amended and supplemental bills" in the above causes. It was alleged in these bills in substance, in addition to what had been alleged in the other bills, that, notwithstanding the injunction of the court, the Ellises had made a compromise settlement of the policies of insurance, pursuant to the stipulation just set out, and that complainant was willing to ratify and confirm the settlement upon the payment into court of this sum, to be held subject to the further order of the court as to her rights therein. There were other allegations, but they need not be noticed. The prayer of the bill was for a decree requiring defendants to pay the sum into court, and that this money be decreed to complainant as administratrix.

Upon the filing of these supplemental bills, an agreement was entered into between the parties, as follows:

"(1) That no objection shall be made by any defendant to the filing of the supplemental bill, and answers may be filed thereto, or this stipulation may be treated as an answer, to the end that all controversies may be determined on the merits.

"(2) Complainant ratifies and confirms the settlement between defendants; the proceeds of said settlement, to wit, $7,730.82, to be treated as in court and held subject to the rights of the parties as hereinafter agreed.

"(3) It is agreed that the compromise entered into between the insurance companies and the Ellises is as follows: That after the original bills were filed in this cause the Ellises, as assignees, brought suits in the circuit court of Davidson county on the same policies of insurance involved in these causes, the style of said circuit court cases being as follows: [Setting out the style of the cases]—and that the liability upon said policies so in suit has been compromised for the gross sum of $9,500, from which was deducted the sum of $1,769.18, due said insurance companies, by notes for unpaid premiums, leaving a balance of $7,730.82, now on deposit at the First National Bank at Nashville, Tennessee, to the credit of J. C. Bradford and John J. Vertrees, trustees, so deposited February 23, 1907.

"(4) It is agreed that said fund will be placed at interest in said bank by said trustees, and will be held

by them until final decree as to the rights of the parties, when same will be paid in accordance therewith."

Fifth immaterial.

"(6) It is agreed that the total amount of premiums which had been paid on said policies is as follows, as evidenced by notes deducted from the sum of $9,500—$1,769.18.

"(7) Counsel for the Ellises endeavored to induce counsel for Mrs. Bendet to consent to a compromise with the insurance companies upon the condition and offer of ten per cent to Mrs. Bendet of any amount that should be received by compromise, which offer was refused.

"(8) This stipulation shall in no wise affect or impair the rights of the parties or their status as it now is, except as herein expressly specified and stipulated."

There were some facts, other than those already mentioned, tending to show that, when application was made for the policies, Solomon Bendet made false representations as to his age and as to his health; also to the effect that Mrs. Bendet, although aware of the falsity of her husband's statements referred to, endeavored to support and sustain them in her deposition in these causes; likewise that the family of Bendet knew that he had this insurance, and that the Ellises were paying the premiums; also that some of them objected to his carrying this insurance, and that he had told his family that he had dropped it, a short while before his death. We do not think this evidence has any material

bearing upon the turning-point in the present controversy; but, after considering and disposing of that point we shall refer again to this evidence, so far as we may deem it necessary to state our views thereon.

The case came on for hearing before the chancellor upon the supplemental bills, the answers thereto, and the evidence which had been previously taken in the cause, and thereupon all of the bills were dismissed by the chancellor, from which action the complainant has brought the cases by appeal to this court.

We shall now give our views of the rights of the parties under the facts above stated.

The question involved is one controlled almost wholly by authority, and we think has been settled in this State.

We think the present case falls directly within the authority of *Quinn* v. *Catholic Knights,* 99 Tenn., 80, 41 S. W., 343. In that case an agreement was made between Quinn and Carter that a former policy which Quinn had on his life should be surrendered, and a new one issued to him and assigned to Carter, and this was done. The consideration which Carter agreed to pay was to reimburse Quinn the amount he had paid out to maintain the former policy, and to assume and pay all dues and assessments which might thereafter accrue against Quinn on account of his membership. Carter carried out his contract, paying to Quinn $55, the sum the latter had paid on the former policy, and from time to time, as assessments accrued, in all about $600. Quinn

then died, and the insurance company, or association, paid to Carter the full amount of the policy, $2,000. This payment was made over the protest of Mrs. Mary Quinn, the wife of Thomas Quinn, the insured, who had qualified as executrix of the estate and set up claim to the fund. She therefore filed her bill as executrix against Carter, seeking to recover of him the amount paid to him by the association, less the amount expended by him in keeping this policy alive, with the sum added which had been paid by Mr. Carter directly to the insured, Thomas Quinn.

Here it will be observed the policy was issued under an agreement made before hand between the assured and the prospective assignee that it should be issued for the purpose of being assigned and that the proposed assignee should pay the first and all further premiums and have the proceeds of the policy.

The chancellor dismissed Mrs. Quinn's bill, but on appeal to this court the decree of the chancellor was reversed, and a decree rendered in her favor in accordance with the prayer of the bill. In disposing of the question the court said:

"The question . . . is, will this court sustain the title of an assignee, where the assignment of the policy follows upon the negotiations already detailed, and where the assignee of his own means, in fulfillment of a promise contemporaneous with its issuance, keeps it alive in his own interest, and simply as a matter of pecuniary profit.

Bendet v. Ellis.

"We have no hesitation as to the proper answer to this question. Such a transaction is purely speculative on the part of the assignee, entered upon by him as a wagering interest, from which the largest profit is to be derived from the termination of the insured's life, and the heaviest loss to accrue from its long continuance. A transaction of this character is obnoxious to the law, as violative of a sound public policy, and should not be sustained. . . .

"The conclusion reached by us, however, does not invalidate the insurance itself. Quinn had an insurable interest in his own life, and under the rules of this society his membership entitled him to the beneficial certificate which was issued. The Order of Catholic Knights, recognizing it as a binding obligation on its part, has paid over the proceeds of this certificate to defendant Carter. This being so, what are the rights of the complainant as against him?

"While the law, under the facts disclosed, discountenances the assignment under which these proceeds were collected by the assignee, yet this is alone on the ground of public policy. 'No fraud or deception upon any one was designed by the agreement, nor did its execution involve moral turpitude.' *Warnock* v. *Davis,* supra. It is a transaction from which a court of chancery is not necessarily repelled, so as to be unable to adjust the respective equities of the parties. 'It is one which must be treated as creating no legal right to the proceeds of the

120 Tenn—19

policy beyond the sums advanced upon its security, and the courts will therefore hold the recipient of the moneys beyond these sums to account to the representatives of the deceased.' 104 U. S., 775, 26 L. Ed., 924. It was lawful for Carter to advance the money to reimburse Quinn and to keep alive this insurance. What was unlawful was that he should make these advancements upon a stipulation that they should be considered an investment on which he was to realize large speculative profits. In the words of the supreme court of the United States in the case of *Warnock* v. *Davis,* supra, the assignment was only invalid as a transfer of the proceeds of the policy beyond what was required to refund the sums, with interest."

Thereupon the court reversed the decree of the chancellor, and gave Mrs. Quinn a decree for the money in the hands of Carter, less the aforesaid advancements made by Carter.

We need go no further than this case, since it is wholly conclusive of the controversy; but we may add that it is in accord with the weight of authority upon this particular phase of the question: *Cammack* v. *Lewis,* 15 Wall. (U. S.), 643; 21 L. Ed., 244; *Warnock* v. *Davis,* 104 U. S., 775, 26 L. Ed., 924; *Tate* v. *Com. Building Ass'n,* 97 Va., 74, 33 S. E., 382, 45 L. R. A., 243, 75 Am. St. Rep., 770; *Mut. L. Ins. Co.* v. *Richards,* 99 Mo. App., 88, 72 S. W., 487; *Kohr* v. *Wolf* (Pa.), 16 Wkly. Notes Cas., 189, cited in *Hoffman* v. *Hoke,* 122 Pa., 377, 15 Atl., 437, 1 L. R. A., 230; *Wegman* v. *Smith* (Pa.), 16

Wkly. Notes Cas., 186; *Van Ormer* v. *Hornberger*, 142 Pa., 575, 21 Atl., 887. There are cases to the contrary: *Powell* v. *Dewey*, 123 N. C., 103, 31 S. E., 381, 68 Am. St. Rep., 818; *Burbage* v. *Windley*, 108 N. C., 357, 12 S. E., 839, 12 L. R. A., 409; *Cisna* v. *Sheibley*, 88 Ill. App., 385; *Metropolitan L. Ins. Co.* v. *Ellison*, 72 Kan., 199, 83 Pac., 410, 3 L. R. A. (N. S.), 935, 115 Am. St. Rep., 189. These are excellent authorities; but we think the sounder reason, from the standpoint of public policy, rests with our own case cited, supra, and the cases in accord therewith. In *Tate* v. *Com. Building Ass'n*, it is said:

"To allow any one to retain the proceeds of a policy of insurance, if the insurance company chose voluntarily to pay it, which was effected for his benefit upon the life of an other, in which life he had no insurable interest, whether the policy was issued upon the life of the insured directly for such beneficiary, or for the benefit of the insured and then assigned by him to the beneficiary, would encourage speculation upon the chances of human life, with a direct interest in its early termination, contrary to the public interest and in contravention of the policy of the law. The denial of all right in the beneficiary to retain in such case more of the proceeds of the policy of insurance than is necessary to reimburse him for premiums paid and expenses incurred dissipates all hope of profit and removes the temptation to speculate in insurance upon human life."

We are referred, as an authority for the opposite view,

to the case of *Bloomstein* v. *Bloomstein,* 1 Tenn. Ch. App., 187, the decree in which case was affirmed by this court on appeal from the court of chancery appeals. That case, however, when closely examined, is not authority for the proposition to which it is cited. In that case it appeared that the niece of Louis Bloomstein took out a policy of insurance upon his life. It was issued directly to her, and upon the death of Louis Bloomstein paid to her. The court said, in that case, speaking through Judge Wilson: "Louis Bloomstein did not take out the policies in issue here. He paid none of the premiums to keep them alive. They were not issued to him. He made no assignment of them after they were issued. His widow and children had no connection, financial, contractual, or otherwise, with the policies." These facts clearly distinguish the case from the one which we now have under consideration, wherein it appears that the policies were issued directly to the insured, and by him assigned to the present claimants. Further distinguishing the *Bloomstein Case,* the court in that case said: "So far as is disclosed by the record, Louis Bloomstein did not know at the time, and died without knowing, that his niece had made a bet or wager on the shortness or length of his life." It is true that in the *Bloomstein Case* there is some language of Judge Wilson, used *arguendo,* which supports the defendant's contention; but the case upon its facts, the actual decision, does not.

We are also referred to *Clement* v. *Insurance Co.,* 101 Tenn., 35, 46 S. W., 561, 42 L. R. A., 247, 70 Am. St.

Rep., 650. But that case does not apply to the special phase of the question we have before us here. In that case the contest was between the assignee and the insurance company. It was, to be sure, based on a policy of insurance which had been procured but to be assigned; but the court confined the decision to the relations between the company and the assignee. It was said the policy was void in its inception; but whether the insured could recover under the rule of public policy was not decided in that case, and could not be.

We are referred to several other cases, where the controversy was directly between the insurance company and the assignee of the policy, or in a suit brought by some one for his use, viz., *Keystone Mut. Ben. Assn.* v. *Norris,* 115 Pa., 446, 8 Atl., 638, 2 Am. St. Rep., 572; *Gordon* v. *Ware Nat. Bank,* 132 Fed., 444, 65 C. C. A., 580, 67 L. R. A., 550; *Brockway* v. *Mut. Ben. L. Ins. Co.* (C. C.), 9 Fed., 249, in each of which a recovery was denied the assignee on the ground that he had no insurance interest and that the contract was a mere wager as to him.

There is also a case cited by defendant's counsel (*Bromley's Adm'r* v. *Washington L. Ins. Co.,* 92 S. W., 17, 28 Ky. Law Rep., 1300, 5 L. R. A. [N. S.], 747) in which a recovery was denied the administrator of the original beneficiary named in the policy, the insured, because the contract was a mere wager. In this case it appeared that the policy was really procured by Bromley for one Bates, who had no insurable interest, and

that after it was issued it was assigned and delivered to Bates as part of the original transaction. Bromley died, and suit was brought by his administrator against the insurance company. Held, as above stated, there could be no recovery because the transaction was a wagering one.

In a prior case from the same State (*New York Life Ins. Co.* v. *Brown*, 66 S. W., 613, 23 Ky. Law Rep., 2070) it appeared that a policy was issued by the insurance company to Charles L. Brown, and that the first premium was paid by George Pinson, Jr.; Brown stating to the insurance agent that Pinson paid for him at his request. The policy, when prepared for delivery, was mailed to Brown, care of George Pinson, Jr. After the policy came Brown and Pinson made an agreement for Pinson to pay all future premiums and $500, at the death of Brown, to the latter's father, and the policy was assigned to Pinson. Brown died, and suit was brought by his administrator, and a recovery allowed. The court said that neither Brown nor Pinson supposed they were doing anything wrong, that both of them told the agent of the company of the contemplated assignment at the date of the application, and that it was subsequently registered as a public document.

We are referred to *Crichfield* v. *Bermudez Asphalt Paving Co.*, 174 Ill., 466, 51 N. E., 552, 42 L. R. A., 347; *Coppell* v. *Hall*, 7 Wall. (U. S.), 542, 19 L. Ed., 244; *Pullman Palace Car Co.* v. *Central Transportation Co.*, 171 U. S. 138, 18 Sup. Ct., 808, 43 L. Ed., 108, and

*McMullen* v. *Hoffman,* 174 U. S., 639, 19 Sup. Ct., 839, 43 L. Ed., 1117, in which the rule is very strongly stated that no right of action can grow out of or be based on a contract in violation of public policy or of the law, and that, instead of giving relief under such circumstances to either party, the law will leave them where it finds them. In the first case cited (*Crichfield's Case*), the plaintiff had brought an action to recover compensation on a contract he had made with defendant to lobby paving contracts for the defendant through the local municipal legislative body governing the city of Chicago. In *Coppell* v. *Hall,* the plaintiff sought an accounting of defendant in respect of a contract made with the defendant in violation of the laws of the United States. In *Pullman Palace Car Co.* v. *Central Transportation Co.,* the defendant sought relief on a cross bill in respect of certain contracts and patents it had transferred to the cross-defendant in violation of its duty as a corporate body, and also for damages its business had sustained by reason of operations thereunder. In *McMullen* v. *Hoffman* the complainant sought an accounting in respect of an illegal contract entered into with the defendant, whereby they had jointly defrauded the city of Portland by collusive biddings on certain public work offered to the lowest bidder.

Of course, this special subject-matter of the litigation does not alter the general principle involved; but it enables us better to understand the point of view of the court.

The purpose of the rules administered in the cases referred to is to prevent fraud and wrongdoing. It has been thought by the judges in some of the cases above cited that the best way to prevent wager contracts of insurance is, not only to deny relief on contracts of this character when they are sued on, but to deprive the persons who finance such enterprises of the power to hold the proceeds when paid over to them by the insurance company. We find the theory, if not decided, intimated that a kind of trust is raised in behalf of the representatives of the person whose life is insured, or at least that a duty to pay is imposed by law, or a right of action is raised out of the facts. This is somewhat similar to the rule that, although a fund was realized as the result of an illegal transaction, yet, if paid over to a third person for one of the participants, that person cannot retain it on the ground of the original illegal transaction, but the law will raise an indebtedness in assumpsit against him in favor of the party for whose benefit the fund was placed in his hands. *McMullen* v. *Hoffman*, 174 U. S., at pages 656, 657, 19 Sup. Ct., at page 846, 43 L. Ed., 1117; *Tenant* v. *Elliott*, 1 Bos. & P., 2. In the last case cited "it was held that where two persons had entered into an illegal contract in regard to insurance, and, a loss having occurred, the insured paid the money to a third person to be paid to plaintiff, the third person could not himself retain the money, because it arose out of an illegal contract." It seems to be in analogy to the rule, or rather this exception to the general rule,

that some courts have construed the transaction as money paid for the benefit of the representatives of the insured, and, further, it may be said that, the illegal arrangement being completed and at an end, there is no question of enforcing any illegal contract.

Another view is: The recovery is not allowed in the way of enforcing an illegal contract; but it is said in substance that the party had an insurable interest in his own life, and that far the contract is good. The assignment simply is void. This seems to be the principle on which *Warnock* v. *Davis*, supra, proceeds.

In that case it appeared that the parties made, in the outset, before the issuance of the policy, an agreement that nine-tenths of the amount due and payable on the policy at the time of the death of the insured should be the absolute property of the Scioto Trust Association, under which name Davis and the other defendants in the causes were trading as partners, and that, when the policy should be issued, it should be assigned by the insured to the said Scioto Trust Association; that one-tenth of the policy should be subject to whatever disposition the insured should otherwise desire to make of it; that the policy to be issued on the application should be delivered to, and be forever held by, the Scioto Trust Association; and that it should have the right to collect the same. In consideration of the foregoing, the Scioto Trust Association agreed "to keep up and maintain said life insurance at their exclusive expense, to pay all dues, fees, and assessments due and payable on said

policy, and to keep said party of the first part harmless from the payment of such dues and assessments, and to procure the payment of one-tenth of the moneys due and payable on said policy after the death of said party of the first part, when obtained from and paid by said Protection Life Insurance Company to the party or parties entitled thereto, according to the disposition made thereof by said party of the first part in his said transfer and assignment of said policy, but subject to the aforesaid lien and deduction." The policy bearing even date with the agreement, was issued to Crosser, the insured, and on the following day he executed to the Scioto Trust Association an assignment of it, in strict accord with the antecedent agreement. In speaking of this matter the court said, through Mr. Justice Field:

"Although the agreement between the trust association and the insured was invalid as far as it provided for an absolute transfer of nine-tenths of the proceeds of the policy upon the conditions named, it was not of that fraudulent kind with respect to which the courts regard the parties as alike culpable and refuse to interfere with the results of their action. No fraud or deception upon any one was designed by the agreement, nor did its execution involve any moral turpitude. It is one which must be treated as creating no legal right to the proceeds of the policy beyond the sums advanced upon its security, and the courts will therefore hold the recipient of the money beyond these sums to account to the representative of the deceased. It was lawful for the

association to advance to the assured the sums payable to the insurance company on the policy as they became due.  It was also lawful for the assured to assign the policy as security for their payment.  The assignment was only invalid as a transfer of the proceeds of the policy beyond what was required to refund those sums, with interest.  To hold it valid for the whole proceeds would be to sanction speculative risks on human life and encourage the evil for which wager policies are condemned." 104 U. S., 781, 26 L. Ed., 927.

This was substantially the view taken by this court in *Quinn* v. *Catholic Knights,* supra.

It is also the view taken by the Virginia supreme court of appeals in *Tate* v. *Com. Building Ass'n,* supra, in which the court said, in addition to what has already been quoted from that case:

"The agreement was not intrinsically immoral or evil. No fraud or deception upon any one was designed by the agreement.  Its execution involved no moral turpitude. It was simply condemned by the law, because contrary to the interests of society.  In such case the maxim '*in pari delicto*' is not inflexibly applied; but the court will consider whether public policy will be promoted, and like agreements be discouraged, by enforcing or avoiding the agreement, and, if the policy of the law will be advanced by granting relief, it will be given.  Pom., Eq. Jur., sections 403, 941; 1 Story, Eq. Jur., section 298; *Starke's Ex'r* v. *Littlepage,* 4 Rand. (Va.), 368;

*Cardwell* v. *Kelly,* 95 Va., 570, 28 S. E., 953, 40 L. R. A., 240."

Whatever may be the true theory underlying the action, it is certain that the policy of the law, in respect of wager contracts of insurance, is best subserved by granting the relief.

It is clear that in this case there is no more ground for imputation of fraud against Bendet, the insured, than there was in the cases of *Warnock* v. *Davis,* supra, and *Quinn* v. *Catholic Knights,* supra, since in the present case the insurance agents who negotiated the several policies were fully informed of the exact nature of the projected transaction. The facts present a case simply where the parties undertook to make a contract for insurance, which was invalid so far as it provided for any interest in the Ellises, but was valid in so far as there was insurance effected upon the life of Bendet.

It is insisted that Bendet committed a fraud on the insurance companies in misrepresenting his age in the application; also that he misrepresented his physical condition, in that he represented that he had not been  afflicted with certain sicknesses within a time specified. We think the record shows that such misrepresentations were made. Whether they were made ignorantly or through forgetfulness, we do not think it necessary to consider, since these were matters of which only the insurance companies could complain, and, they having paid over the money, the question cannot now be raised by any one.

Bendet v. Ellis.

It is insisted that the misrepresentations just referred to were known to Mrs. Bendet, who is now the administratrix of her husband, and is suing to recover the money involved in the present controversy; and it is further insisted that in her deposition she still tried to maintain the truth of these representations, when she must have known that they were false. Even if this be sustained by the record as strongly as stated, still we do not think it could have any effect upon the question whether Mrs. Bendet, as administratrix of her husband, is entitled to recover the fund paid over by the insurance companies to Messrs. Ellis.

On the ground stated, we are of opinion that the decree of the chancellor was erroneous, and must be reversed, and that the complainant is entitled to a decree for the fund involved in this controversy, and which has been lent out, as shown by the record, to await the decision of the court in this cause.

A decree will therefore be entered accordingly, and the cause will be remanded for the collection and application of the fund.

In view of a peculiar nature of the case, we think that all of the costs, both of this court and of the court below, should be paid out of the fund, and the decree to be entered herein will so adjudge and direct.